UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JAN -4  AM 9: 49

CLERK

BY_____
DEPUTY CLERK

BANK OF AMERICA, N.A.,            )
                                 )
        Plaintiff,               )
                                 )
        v.                       )          Case No. 5:16-cv-83
                                 )
NEW ENGLAND QUALITY SERVICE,     )
INC., EARTH WASTE & METAL, INC., )
EWM REAL ESTATE, INC., EWM, INC.,)
EWS OF NY, INC., AMERICAN WASTE  )
& METAL OF TN, INC., AMERICAN    )
WASTE & METAL, LLC, WYRE WHEEL   )
REAL ESTATE, INC., AMERICAN      )
WASTE & METAL COMPANY OF NEW     )
YORK, LLC, CASE STREET HOLDINGS, )
LLC, AMERICAN IRON & METAL OF    )
TN, INC., and KEVIN C. ELNICKI,  )
                                 )
        Defendants.              )

**OPINION AND ORDER**
(Doc. 7)

Plaintiff Bank of America, N.A. ("BOA" or "the Bank") sues the above-captioned

corporate defendants and Defendant Kevin C. Elnicki—the owner, member, officer, or principal

of the corporate defendants—seeking to enforce BOA's rights in connection with certain

commercial loans, credit agreements, and security agreements between the parties.

(*See* Doc. 1.) Defendants filed a four-count Counterclaim,[1] asserting that BOA breached the

loan agreement, breached its duty of good faith and fair dealing, intentionally interfered with

contractual relations, and is liable for punitive damages. (*See* Doc. 6.) BOA moved to dismiss

the Counterclaim (Doc. 7), and Defendants moved to amend their Counterclaim (Doc. 45). At a

---

[1] Defendant Wyre Wheel Real Estate, Inc. ("Wyre Wheel") filed a separate Answer to
BOA's complaint (*see* Doc. 21), and did not join the counterclaim or any of the motions that are
now pending. For simplicity, the court refers here to all defendants except Wyre Wheel as
"Defendants."

September 27, 2016 motion hearing, the court granted Defendants' motion to amend their Counterclaim, and decided to consider the merits of BOA's Motion to Dismiss the Counterclaim (Doc. 7) in light of Defendants' Amended Counterclaim (Doc. 48).  BOA also seeks to strike Defendants' demand for a jury trial.  (Doc. 7 at 17.)

## Background

The factual allegations in the Amended Counterclaim include the following.[2]  The court begins by briefly summarizing the credit facilities that BOA extended to Defendants between 2012 and 2015.  The court then discusses Defendants' allegations of a course of dealing between the parties and a planned "tripartite debt consolidation program."  Finally, the court recites the events giving rise to each party's claim that the other party defaulted or breached.  Additional facts are set forth as necessary in the analysis below.

## I.     Credit Facilities Extended by BOA to Defendants

It is unnecessary here to recite all of the details of each of the agreements between BOA and Defendants.  The court starts with summaries of the loans to NEQS in 2012 and 2013 and the loans to Earth Waste in 2014 and 2015.  The court then briefly highlights some of the key provisions of those loans.

### A.     Loans to NEQS in 2012 and 2013

The parties began a lending relationship on or about August 15, 2012, when Defendant New England Quality Service, Inc. ("NEQS") and BOA entered into an agreement (the "2012 Loan Agreement") in which BOA agreed to lend to NEQS: two separate $500,000 lines of credit (LOCs), and one $3,600,000 variable-rate term loan.  (*See* Doc. 48 ¶ 5; *see also* Doc. 1 ¶ 52; Doc. 1-13 (copy of the 2012 Loan Agreement).)  On or about April 16, 2013, BOA and NEQS

---

[2] The court also refers to facts admitted by Defendants in their Verified Amended Answer (Doc. 24).

executed Amendment No. 1 to the 2012 Loan Agreement, which included the addition of a $650,000 LOC as a fourth credit "facility." (*See* Doc. 48 ¶ 27; Doc. 1-18 (copy of Amendment No. 1).) On or about November 15, 2013, BOA and NEQS executed another loan agreement (the "2013 Loan Agreement") in which BOA agreed to extend to NEQS another $500,000 LOC. (*See* Doc. 1 ¶ 76; Doc. 1-24 (copy of 2013 Loan Agreement).)[3]

**B.      Loans to Earth Waste in 2014 and 2015, Including the Shredder Loan**

On or about October 28, 2014, and in furtherance of a 2013 decision to acquire a new metals shredder, Earth Waste & Metal, Inc. ("Earth Waste") and BOA entered into a lending agreement (the "4.5MM Loan Agreement" or "shredder loan agreement"), under which BOA agreed to make available to Earth Waste a non-revolving convertible line of credit in the amount of $4,582,272. (*See* Doc. 48 ¶¶ 13–15; *see also* Doc. 1 ¶ 18; Doc. 1-1 (copy of the 4.5MM Loan Agreement).) The shredder loan agreement included a number of covenants, one of which was an obligation for Earth Waste to provide BOA with "financial information and statements" at regular intervals and "such additional information as requested by the Bank from time to time." (Doc. 1-1 at 7.) In particular, Earth Waste was required to supply BOA with its annual financial statements, reviewed by a certified public accountant, within 120 days of Earth Waste's fiscal year end. (*Id.*)[4] Another covenant required Earth Waste "to maintain on a consolidated basis a

---

[3] On or about January 9, 2013, NEQS also obtained a commercial credit card with an aggregate maximum charge limit of $250,000. (*See* Doc. 1 ¶¶ 86, 88; *see also* Doc. 1-27 (copy of commercial card account agreement).) BOA asserts that it is the successor by merger to the issuer of that credit card. (*Id.* ¶ 87.)

[4] The shredder loan agreement stipulated that "[e]xcept as otherwise stated in this Agreement, all financial information provided to the Bank and all financial covenants will be made under generally accepted accounting principles, consistently applied or another basis acceptable to the Bank." (*Id.* at 12.)

Basic Fixed Charge Coverage Ratio" of at least 1.15 to 1.0 through December 30, 2015. (*See* Doc. 48 ¶ 34; *see also* Doc. 1-1 at 8–9.)[5]

The shredder loan agreement defined default to include failure to comply with any covenant or obligation contained within the agreement.  (*See* Doc. 1-1 at 12.)  The agreement further defined default to include the circumstance where "any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank."  (*Id.*)[6] Upon an event of default, BOA's remedies included the right to "stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately." (*Id.* at 11.)

Drawing on the line of credit extended under the shredder loan, Earth Waste borrowed more than $1 million from BOA, and entered into contractual obligations with third party to purchase a metals shredder.  (Doc. 48 ¶ 35.)  On or about February 4, 2015, BOA extended an additional $500,000 LOC to Earth Waste.  (*See* Doc. 1-7.)  On or about February 13, 2015, BOA extended a $2,540,000 term loan to Earth Waste.  (*See* Doc. 1-11.)[7]

---

[5] The shredder loan agreement defined "Basic Fixed Charge Coverage Ratio" as the ratio of "Cash Flow" to "the sum of the current portion of long term debt and the current portion of capitalized lease obligations, plus lease and rent expense plus cash interest expense paid on all obligations."  (Doc. 1-1 at 9.)  It stated that the Basic Fixed Charge Coverage Ratio would be "tested on a quarterly and annual basis."  (*Id.*)

[6] "Obligor" is defined to include "any guarantor, [or] any party pledging collateral to the Bank."  (*Id.*)  Under that definition, NEQS was an "Obligor," since it pledged collateral to secure Earth Waste's obligations under the shredder loan.  (*See id.* at 4.)

[7] On or about November 5, 2014, Earth Waste also obtained a commercial credit card with an aggregate maximum charge limit of $60,000.  (*See* Doc. 1 ¶¶ 94, 95; *see also* Doc. 1-28 (copy of commercial card account agreement).)  BOA asserts that it is the successor by merger to the issuer of that credit card.  (*Id.* ¶ 94.)

### C.      Summary of Initial Repayment Terms; Pay-on-Maturity Provisions

Under the 2012 Loan Agreement, absent a renewal, the "expiration date" for the first LOC was August 15, 2013, at which time the agreement called for NEQS to "repay in full any principal, interest or other charges outstanding." (Doc. 1-13 at 2.) The "expiration date" for the second LOC was also August 15, 2013, at which time the agreement called for NEQS to repay the principal amount outstanding monthly "in equal installments beginning on October 1, 2013 . . . and ending on September 1, 2018." (*Id.* at 3.) The 2012 Loan Agreement also called for NEQS to pay interest on the $3.6 million term loan in monthly installments, and to repay the principal of the loan in monthly installments between August 2012 and August 2019. (*See id.* at 5, 23.) The additional $650,000 LOC added by Amendment No. 1 was available until January 31, 2014, at which time the agreement called for NEQS to "repay in full any principal, interest or other charges outstanding." (Doc. 1-18 at 1.) The "expiration date" for the 2013 Loan Agreement was November 15, 2014, at which time the agreement called for NEQS to repay the amount outstanding "in equal combined installments of principal and interest" monthly until November 15, 2019. (Doc. 1-24 at 1.)

The shredder loan required Earth Waste to repay the principal in monthly installments from December 1, 2015 through November 3, 2025. (Doc. 1-1 at 2; 18–20.) The repayment terms of the February 4, 2015 LOC set June 30, 2015 as the "expiration date," and required Earth Waste to repay all principal, interest, and charges by that date. (Doc. 1-7 at 2.) The repayment terms of the February 13, 2015 term loan called for the principal to be repaid in installments from May 1, 2015 until October 1, 2021. (Doc. 1-11 at 2, 18–19.) All of the relevant agreements state that failure to make a payment when due is an event of default. (*See* Doc. 1-1 at 12; Doc. 1-7 at 11; Doc. 1-11 at 12; Doc. 1-13 at 16; Doc. 1-24 at 13.)

5

II.     **Course of Performance and Planned "Tripartite Debt Consolidation Program"**

According to Defendants, beginning in mid-2013, BOA and Defendants began working together on a "loan consolidation program." (Doc. 48 ¶¶ 8, 11.)  As Defendants describe it, at some point in 2015, the parties had identified a "final lending design" consisting of the following three components:

> a) new money of at least four million dollars secured by certain business chattels
> for a modernization and expansion of NEQS's existing metal-shredding activity;
> b) new money for the purchase of five transfer stations in Washington County,
> New York for approximately $1.7 million, to be secured by a real estate mortgage
> on said property, which was appraised at over three million dollars; and
> c) refinancing of all existing NEQS debt with BOA, to be consolidated with the
> shredder loan and the real estate loan.

(*Id.* ¶¶ 12, 20.)[8]  Defendants describe this alleged plan as the "tripartite debt consolidation program." (*Id.* ¶ 21.)  Defendants assert that the parties intended for all three components of the plan to be accomplished "in sync" during 2015.  (*Id.* ¶¶ 16–17.)

Defendants allege that BOA line lender Scott Card referred to BOA as NEQS's "partner" in the planned loan-consolidation program. (*Id.* ¶ 11.)  Mr. Card was "not concerned" about payment of the existing LOCs prior to final debt refinancing and consolidation. (*Id.* ¶ 24.)  In fact, according to Defendants, at no time from 2012 to August 2015 did BOA invoke the pay-on-maturity provision of any of the several LOCs. (*Id.* ¶¶ 7, 9.)  Instead, BOA "rolled over the LOCs post-maturity when needed, pending pay-off from the anticipated refinancing" component of the three-part loan-consolidation program. (*Id.* ¶¶ 10, 25–33.)

---

[8] According to Defendants, on June 9, 2014, Mary L. Grzeskowiak from BOA had emailed Defendants stating that she was "in the process of reviewing the company's existing loans and requests for additional financing for the shredder and transfer stations to determine the best way to restructure the loans based on historical and projected cash flow." (*Id.* ¶ 31.)

### III.    Alleged Defaults and Breach

After a "Letter Extension," (*see* Doc. 1-8), August 24, 2015 was the new maturity date

for Earth Waste's $500,000 LOC.  After a series of amendments (*see* Docs. 1-19, 1-20, 1-21,

1-22, 1-23), August 24, 2015 also became the new maturity date for NEQS's $650,000 LOC.  As

to both of those LOCs, the August 24, 2015 maturity date was reached without payment in full.

(Doc. 24 ¶¶ 102, 105.)  BOA did not notify Defendants on August 24, or earlier, that it expected

payment in full on that date.  (Doc. 48 ¶ 45.)  According to Defendants, they had "no idea that,

contrary to years of prior dealings, on August 24, 2015 BOA wanted full payment of any LOC."

(*Id.* ¶ 42; *see also id.* ¶ 44.)

On or about August 25, 2015, BOA sent to Earth Waste and several of the other

Defendants a letter entitled "Notice of Default and Reservation of Rights."  (*See* Doc. 1 ¶ 108;

Doc. 24 ¶ 108, Doc. 48 ¶ 38; Doc. 1-29 (copy of the August 25, 2015 letter).)  The letter did not

identify maturity of any LOC as an event of default.  (Doc. 48 ¶ 46; *see also* Doc. 1-29.)  Instead,

referring to the shredder loan agreement, the letter stated: "It has come to the Bank's attention

that there was a covenant failure in respect of the fixed charge coverage ratio[] as calculated in

connection with the financial statements ending June 30, 2015."  (Doc. 1-29 at 1.)  The letter

advised that BOA would "stop making any additional credit available to [Earth Waste] at this

time as authorized under Section 8" of the shredder loan agreement.  (*Id.*)

After Defendants received the August 25, 2015 letter, BOA representatives traveled to

Vermont to meet with Defendants, and "demanded to review confidential financial information

of NEQS and its affiliate companies."  (Doc. 48 ¶ 47.)  According to Defendants, Earth Waste

explained that "according to its accountant, if the Ratio is calculated pursuant to Generally

Accepted Accounting Principles ('GAAP'), [Earth Waste] was in compliance with the Ratio

7

covenant." (*Id.*)  Defendants requested that BOA complete its financing obligations under the

LOC.  (*Id.*)  At the meeting, a BOA representative stated that BOA "wanted out of the

commodities-financing business, and did not agree to provide the financing needed to complete

the shredder project." (*Id.* ¶ 48.)  According to Defendants, BOA's desire to exit the

commodities-financing business was its real, "ulterior" motive for declaring defaults and cutting

off funding.  (*See id.* ¶ 39.)

> On September 28, 2015, Defendants stated as follows in a letter to BOA:

> As you know, NEQS's accountant has determined, pursuant to GAAP, that the
> covenant has not been violated.  I repeat NEQS's prior request that BOA
> immediately provide the underlying data and calculations it utilized to conclude
> that the Basic Fixed Charge Coverage ratio has been violated.  As to the Business
> Review you requested, please understand that we are willing to comply with the
> loan documents in that regard, as we have in all others.  However, my staff and I
> also have a business to run.  The Review must be reasonable, both in scope and
> timing . . . . Given NEQS's compliance with the covenant, it is not in default.
> Rather, BOA has breached the loan documents at least by refusing to disburse
> loan proceeds as promised.  As you know, the shredder project is already well
> under way, with NEQS having incurred substantial liability for previous loan
> disbursements, and having invested substantial amounts of its own resources.  For
> BOA to cut off promised funding mid-stream is highly damaging, and deprives us
> of the income stream and other benefits we would realize with completion of the
> project.  I understand that BOA wishes to terminate its lending activities in the
> commodities recycling industry, as you indicated at our recent meeting.
> Nonetheless, it must comply with commitments already made to us.  I look
> forward to receiving the requested documentation, and respectfully demand that
> BOA immediately restore funding as promised so we can complete the shredder
> project forthwith.

(*Id.* ¶ 49.)

> By letter dated December 16, 2015, BOA asserted that Defendants were in default for

multiple reasons.  (*See* Doc. 1-30 at 2–3.)  The letter noted that Earth Waste's $500,000 LOC

and NEQS's $650,000 LOC both matured on August 24, 2015, but had not been paid in full.  (*Id.*

at 2.)  The letter also asserted that Earth Waste's Basic Fixed Charge Coverage Ratio for the

fiscal quarter ending June 30, 2015 was 1.015 to 1.0. (*Id.*)[9] Finally, the letter asserted that Earth Waste had failed to furnish its 2014 final financial statements signed by a certified public accountant; and that Defendants had failed to provide financial information, documentation, and access for inspection as required by various loan documents. (*Id.* at 2–3.) The December 16, 2015 letter stated that BOA "has chosen not to exercise any of its rights and remedies under the Loan Documents at this time . . . , but may choose to do so at any time in the future without any further written notice . . . ." (*Id.* at 3.)

It appears that the parties continued their discussions. According to Defendants, they provided "some but not all of the information requested by BOA" because they were concerned about "the burdensomeness of the requests" and also because they were "gradually becoming suspicious of BOA's bona fides." (Doc. 48 ¶ 54.) Defendants allege that they made a "good-faith" effort to comply with their obligations, and provided BOA with information that was "sufficient for BOA to substantially complete a 'due diligence' review of the lending relationship for purposes of assessing its options." (*Id.* ¶ 55.) But Defendants became concerned that "BOA was improperly disclosing certain of NEQS's confidential financial information to third parties," and requested that BOA enter into a confidentiality agreement. (*Id.* ¶¶ 56–67.) BOA refused, characterizing the request as "inappropriate." (*Id.* ¶ 58.) Defendants refused to provide further information to BOA without a written confidentiality agreement. (*Id.* ¶ 59.)

Finally, in a letter dated March 10, 2016, BOA asserted numerous events of default, and informed Defendants that it demanded payment in full of Earth Waste's $500,000 LOC and NEQS's $650,000 LOC; and that all of the other loans were accelerated and declared due.

---

[9] BOA asserts that its calculation even gave Earth Waste the benefit of the doubt regarding a "non-operating write off" of $146,149 that was not reflected in any of the financial statements that Earth Waste had supplied. (*Id.* at 2 n.1.)

(*See* Doc. 48 ¶ 60; *see also* Doc. 1-32 (copy of March 10, 2016 letter).)  BOA demanded

payment by March 17, 2016.  (Doc. 1-32 at 6.)  None of the Defendants made payment to BOA

as demanded.  (*See* Doc. 1 ¶ 116; Doc. 24 ¶ 116.)  For its part, to date, BOA has not restored

funding for the shredder loan.  (Doc. 48 ¶ 50.)  According to Defendants, this has rendered them

"unable to fulfill certain . . . obligations to third parties," subjected them to claims by others, and

prevented them from "realizing the business benefits [they] otherwise would have from

completion of the shredder project, including reduced costs and increased profits."  (*Id.* ¶ 41.)

BOA filed this lawsuit on April 1, 2016.  (Doc. 1.)

## Analysis

### I.       Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

*see also* Fed. R. Civ. P. 8(a)(2).  The court must also draw all reasonable inferences in the non-

moving party's favor.  *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016).  Dismissal is

appropriate when "it is clear from the face of the complaint, and matters of which the court may

take judicial notice, that the plaintiff's claims are barred as a matter of law."  *Conopco, Inc. v.

Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

### II.      Applicable Law for Deciding BOA's Motion to Dismiss

The various agreements governing the credit facilities select different jurisdictions as

supplying governing law.  Delaware and North Carolina law govern the two commercial credit

card agreements.  (*See* Docs. 1-27 at 5; 1-28 at 11.)  The 2012 Loan Agreement with NEQS

selects New York law.  (*See* Doc. 1-13 at 17.)  The 2013 Loan Agreement with NEQS selects

Vermont law.  (Doc. 1-24 at 24.)  All of the relevant loan agreements with Earth Waste

(including the shredder loan) select Vermont law.  (*See* Docs. 1-1 at 13; 1-7 at 12; 1-11 at 13; 1-28 at 11.)

In this diversity case, the court applies Vermont's choice-of-law rules.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016).  "The Vermont Supreme Court has adopted the Restatement (Second) of Conflict of Laws for choice-of-law questions in contract matters."  *Kearney v. Okemo Ltd. Liab. Co.*, No. 5:15-cv-00166, 2016 WL 4257459, at *3 (D. Vt. Aug. 11, 2016) (citing *McKinnon v. F.H. Morgan & Co.*, 170 Vt. 422, 423, 750 A.2d 1026, 1028 (2000)).  Generally, the law of the state chosen by the parties to govern their contractual rights and duties is the law to be applied.  *See* Restatement (Second) of Conflict of Laws § 187.

Here, BOA asserts that Defendants' counterclaims "seek a determination of who breached the $4.5MM Loan first."  (Doc. 7-1 at 8.)  If that is a correct identification of the issue raised by the counterclaims, Vermont law would apply under the loan agreement.  (*See* Doc. 7-1 at 14.)  Defendants insist that their counterclaims relate to more than just the shredder loan. (Doc. 23 at 30.)  But Defendants do not advocate for the application of any law other than Vermont law.  The court accordingly proceeds to analyze BOA's Motion to Dismiss with reference to Vermont law.

## III.     Whether Defendants' Counterclaims are Plausible

### A.      Alleged Breach of Loan Agreements (Counterclaim Count I)

To recover damages for breach of contract in Vermont, a party must show the existence of a contract, material breach of a contractual duty, and damages.  *See Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1212 (D. Vt. 1996) (existence of contract and breach); *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 34 n.4, 195 Vt. 524,

90 A.3d 885 (damages).  In Count I of their Amended Counterclaim, Defendants assert that BOA breached the relevant loan agreements in the following ways:

> BOA's conduct in refusing to fund up to the limit specified in the LOC constitutes a breach of contract, as does its characterization as an event of default [Earth Waste's] alleged covenant violation, and resultant loan accelerations and demands.  Further, BOA violated the contract as modified by defaulting NEQS on the grounds of non-payment of LOCs on purported maturity dates without notice; and also by terminating its participation in the parties' extended negotiations and work toward the planned tri-partite lending relationship.

(Doc. 48 ¶ 62.)  According to Defendants, the "core" of their breach-of-contract allegations is "BOA's failure to fund the shredder loan."  (Doc. 23 at 11.)  BOA maintains that all of the alleged breaches "are completely refuted by the documentary evidence," including the terms and conditions of the shredder loan.  (Doc. 7-1 at 8.)

As noted above, the shredder loan agreement stated that, upon an event of default, BOA's remedies included the right to "stop making any additional credit available to the Borrower, and require the Borrower to repay its entire debt immediately."  (Doc. 1-1 at 11.)  BOA's August 25, 2015 letter identified an alleged inadequate Basic Fixed Charge Coverage Ratio as an event of default, and indicated that BOA would stop making additional credit available to Earth Waste. The court assumes, for present purposes, that BOA's announcement meant that BOA stopped lending any money under the line of credit established by the shredder loan.[10]

---

[10] BOA asserts that Defendants have not alleged that they made any request for further extension of credit that BOA refused.  (*See* Doc. 7-1 at 10.)  Giving Defendants the benefit of all reasonable doubts and inferences, the court assumes that—as Defendants stated in their September 28, 2015 letter—BOA had "cut off" funding and this was "highly damaging" to Earth Waste.  In any case, even if Earth Waste did not make any specific subsequent request for an advance of funds under the shredder loan, BOA's announcement that it would stop making credit available could potentially qualify as an anticipatory breach.  *See Record v. Kempe*, 2007 VT 39, ¶ 15, 182 Vt. 17, 928 A.2d 1199.  The main issue presented here is whether there was any basis for excusing BOA's performance; the court discusses that issue below.

If Earth Waste's Basic Fixed Charge Coverage Ratio (the "Ratio") was in fact less than 1.15 to 1 for the period ending June 30, 2015, then, under the terms of the shredder loan, there was a covenant default and BOA was entitled to stop lending additional money under the line of credit. *See Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056–57 (2d Cir. 1992) (where borrower was in default under LOC agreement, lender was entitled to decline further extensions of credit);[11] *see also Sisters & Brothers Inv. Grp. v. Vt. Nat'l Bank*, 172 Vt. 539, 542, 773 A.2d 264, 268 (2001) (mem.) (nonoccurrence of a condition discharges a party's duty to perform).  BOA insists that Earth Waste's Ratio was less than 1.15 to 1.  (*See* Doc. 7-1 at 11.)  But on BOA's motion to dismiss, the court must accept as true Defendants' allegation that Earth Waste maintained the Ratio.  (*See* Doc. 48 ¶¶ 36, 49.)  If that is so, then the purported basis for cutting off additional money under the line of credit articulated in BOA's August 25, 2015 letter was unsupported.

BOA asserts, however, that it did not breach any obligation to advance funds under the shredder loan because there were other events of default that entitled BOA to stop making additional credit available.  (*See* Doc. 7-1 at 12.)[12]  As articulated in its December 16, 2015 letter, BOA asserts that Earth Waste was in default under the shredder loan because of August 24, 2015 maturity defaults on Earth Waste's $500,000 LOC and on NEQS's $650,000 LOC.  As noted above, NEQS was an "Obligor," and the shredder loan defined default to include

---

[11] *Fasolino* involved the application of New York law, but this general principle about remedies for default is no different in Vermont.

[12] The alleged other events of default were not articulated in BOA's August 25, 2015 letter, but the letter expressly stated that it "shall not be deemed to be[] a waiver of, or a consent to, any default, noncompliance, Default, [or] Event of Default . . . now existing or hereafter arising under the Loan Agreement or any of the other Loan Documents."  (Doc. 1-29 at 2.)

the circumstance where "any default occurs under any other agreement the Borrower (or any Obligor) has with the Bank or any affiliate of the Bank." (Doc. 1-1 at 12.)

Defendants maintain that there were no maturity defaults on August 24, 2015 because, by their "course of dealing," the parties modified the terms of Earth Waste's $500,000 LOC and NEQS's $650,000 LOC. (*See* Doc. 23 at 12, 13–15.) In Vermont, "[a] contract is interpreted foremost to give effect to the parties' intent, which is reflected in the contractual language, if that language is clear." *B & C Mgmt. Vt., Inc. v. John*, 2015 VT 61, ¶ 11, 199 Vt. 202, 122 A.3d 511. "Extrinsic evidence may be used to aid in the interpretation of a contract if the contract terms are ambiguous." *Id.* Where the contract terms are ambiguous, one form of extrinsic evidence bearing on the parties' intent is the parties' conduct in performing under the contract. *See id.* ¶ 13.[13]

Here, there is no ambiguity about the maturity dates for Earth Waste's $500,000 LOC and NEQS's $650,000 LOC. After the relevant amendments, the maturity date for both LOCs was August 24, 2015. Under both LOCs, payment of all outstanding principal and interest was due on that date. There is accordingly no basis upon which to refer to extrinsic evidence, such as the parties' course of performance, to determine when payment was due. The agreements also clearly specified BOA's rights in the event of failure to pay at that time; so there is no need to refer to extrinsic evidence on that point either.

---

[13] Although Defendants refer to an alleged "course of dealing," that phrase "usually refers to the parties['] conduct prior to entering the contract," whereas the parties' "course of performance" refers to conduct *after* entering the contract. *See id.* ¶ 13 n.2. Vermont law recognizes that "a course of dealing between parties . . . may give meaning to, supplement, or qualify their agreement." *Mongeon Bay Props., LLC v. Mallets Bay Homeowner's Ass'n*, 2016 VT 64, ¶ 30 (citing Restatement (Second) of Contracts § 223(b)). But Defendants' allegations refer to conduct after contract formation, so "course of performance" is the more appropriate phrase.

Defendants also contend that BOA "waived or is estopped from enforcing" the maturity provisions of Earth Waste's $500,000 LOC and NEQS's $650,000 LOC. (*See* Doc. 23 at 12; *see also id.* at 15.) According to Defendants' allegations, prior to 2015, BOA consistently did not invoke the pay-on-maturity provisions of any of the LOCs, and instead of declaring default after the LOCs matured, BOA consistently "rolled over" the LOCs (post-maturity) in anticipation of the alleged tripartite debt consolidation program. Defendants assert that, in light of that alleged consolidation plan, they did not expect BOA to declare a default or actually demand payment on August 24, 2015.

"[A] waiver is an intentional relinquishment of a known right involving 'both knowledge and intent on the part of the waiving party.'" *Smiley v. State*, 2015 VT 42, ¶ 10, 198 Vt. 529, 535, 117 A.3d 441, 445 (quoting *LaFrance Architect v. Point Five Dev. S. Burlington, LLC*, 2013 VT 115, ¶ 38, 195 Vt. 543, 91 A.3d 364). "Viewed as such, a waiver may be express or implied, but before a waiver may be implied, 'caution must be exercised both in proof and application,' such that '[t]he facts and circumstances relied upon must be unequivocal in character.'" *Id.* (quoting *Holden & Martin Lumber Co. v. Stuart*, 118 Vt. 286, 289, 108 A.2d 387, 389 (1954)).

Here, Defendants allege that Mr. Card was "not concerned" about payment of the existing LOCs prior to the alleged final debt refinancing and consolidation. Mr. Card's alleged conduct or statement is ambiguous, but, giving Defendants the benefit of all reasonable inferences, it could be interpreted as an express waiver of BOA's right to receive payment on the LOCs by the maturity dates, at least until the alleged debt consolidation was complete.

Moreover, accepting Defendants' allegations as true, it would be possible to conclude that BOA impliedly waived the right to receive payment on the maturity dates for Earth Waste's

15

$500,000 LOC and NEQS's $650,000 LOC.  According to Defendants, in anticipation of the

tripartite debt consolidation, BOA consistently did not exercise its right to claim default when

LOC maturity dates arrived, and instead consistently renewed the LOCs weeks or months after

they matured.  *See Tooley v. Robinson Springs Corp.*, 163 Vt. 627, 629, 660 A.2d 293, 296

(1995) (mem.) (where debenture owner consistently accepted late annual interest payments

without reserving right to claim damages or exercising right to claim default, there was sufficient

evidence to conclude that, by his conduct, he had waived any rights for collecting interest on the

late payments); *see also Counsel Fin. Servs., LLC v. The Dobson Firm, LLC*, No. 09-CV-150S,

2010 WL 3504789, at *7 (W.D.N.Y. Sept. 2, 2010) (denying lender's motion for summary

judgment, notwithstanding express contractual terms precluding changes in the parties'

agreement, in part because there was a genuine question as to whether lender waived its right to

declare a default by its long history of accepting late payments).

BOA asserts that there is another, independent basis for it to have found Earth Waste in

default of the shredder loan.  As noted above, the shredder loan required Earth Waste to supply

BOA with its annual financial statements, reviewed by a certified public accountant, within

120 days of Earth Waste's fiscal year end.  (Doc. 1-1 at 7.)  According to BOA's Complaint,

Earth Waste failed to provide 2014 annual financial statements that were reviewed by a certified

public accountant.  (*See* Doc. 1 ¶ 102.)  BOA made this same assertion in its letters dated

December 16, 2015 and March 10, 2016.  (*See* Doc. 1-30 at 3; Doc. 1-32 at 3.)  Earth Waste

denies that particular allegation.  (*See* Doc. 24 ¶ 102 ("otherwise denied").)   Based on the

present state of the pleadings, the court cannot conclude that Earth Waste was in default of this

provision of the shredder loan when BOA issued its August 25, 2015 letter.

In sum, accepting all of Defendants' allegations as true and giving Defendants the benefit of all reasonable inferences, it would be plausible to conclude that Earth Waste was not in default at the time BOA issued its August 25, 2015 letter, and that BOA's announcement in that letter that it would stop making additional credit available was an unexcused failure to perform.

### B.   Alleged Breach of Duty of Good Faith and Fair Dealing (Count II)

In Count II, Defendants assert that BOA violated the covenant of good faith and fair dealing by:

> failing to negotiate and work in good faith toward completion of the preliminary agreement for a tripartite lending relationship; . . . taking advantage of the necessitous circumstances of NEQS; and abusing a power to specify compliance with and/or terminate contractual obligations.

(Doc. 48 ¶ 65.)  BOA asserts that Defendants' counterclaim for breach of the covenant of good faith and fair dealing should be dismissed as duplicative of Defendants' breach-of-contract claim.  (Doc. 7-1 at 14.)  Defendants maintain that Count II is premised on different allegations, including claims that BOA: (1) "purposely derailed" the negotiations of the tripartite debt consolidation program; (2) misused Defendants' confidential financial information; and (3) had an improper ulterior motive when it cross-defaulted all of Defendants' loans.  (Doc. 23 at 18–20.)  BOA replies that all of Defendants' allegations still fail to state a breach-of-fair-dealing claim.  (*See* Doc. 27 at 8.)

The covenant of good faith and fair dealing is implied in every contract.  *Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045.  "It is an implied promise that protects against conduct which violates community standards of 'decency, fairness or reasonableness.'"  *Id.* (quoting *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 161 Vt. 200, 209, 635 A.2d 1211, 1216 (1993)).  "A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different

17

conduct." *Id.*; *see also Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298 ("[W]e will not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when the plaintiff also pleads a breach of contract *based upon the same conduct*.").

The court begins with Defendants' assertion that BOA breached the covenant of good faith and fair dealing by "purposely derailing"—for an improper ulterior motive—negotiations or a "preliminary agreement to complete the planned tripartite debt consolidation." (Doc. 23 at 17–18.) The Vermont Supreme Court has recognized that there are multiple forms of "preliminary agreements," some of which—depending on the intentions of the parties—can be legally binding. *See Bixler v. Bullard*, 172 Vt. 53, 58, 769 A.2d 690, 694 (2001) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987)). Here, it is too early to decide whether there was a binding preliminary agreement. *See id.* ("Intent to be bound is a question of fact to be determined at trial."). But if there was an agreement of the type Defendants say, then the agreement was "to negotiate the open issues in good faith" in an attempt to achieve the tripartite debt consolidation. *Teachers Ins. & Annuity Ass'n*, 670 F. Supp. at 498. Giving Defendants the benefit of all reasonable inferences, if they can prove that there was a binding preliminary agreement, then they may also be able to prove that BOA stopped negotiating because BOA's actual purpose was to exit the commodities-financing business.

Defendants further assert that BOA breached the covenant of good faith and fair dealing by misusing Defendants' confidential financial information. The Amended Counterclaim contains relatively sparse allegations on that point, but it does allege that Defendants became concerned that BOA was improperly disclosing confidential financial information to third parties, and that BOA refused to enter into a confidentiality agreement. (Doc. 48 ¶¶ 56, 58.) The

agreements in this case gave BOA access to Defendants' financial information in order for BOA to assess the financial health of the borrower. If BOA disclosed that sensitive information to third parties, that would be inconsistent with the limited purpose of the parties' agreements, and could be a basis for a fair-dealing claim.

Finally, Defendants allege that BOA had an improper ulterior motive when it cross-defaulted all of Defendants' loans. Defendants' breach-of-contract claim is based on the same conduct. Since the loan agreements provided that a default under one is a default under all, Defendants' argument that BOA improperly cross-defaulted all of the loans is based on the same alleged improper default of the shredder loan. The court will dismiss that portion of Count II as duplicative of the breach-of-contract claim.

### C.      Alleged Intentional Interference with Contractual Relations (Count III)

In Count III, Defendants claim that "BOA has intentionally interfered with [Earth Waste's] existing contractual relations *inter alia* by rendering it impossible for [Earth Waste] to perform under certain contracts in relation to the shredder project, which required provision of the promised LOC financing to complete." (Doc. 48 ¶ 68.) BOA seeks dismissal of Count III, asserting that the claim lacks sufficient factual allegations. (*See* Doc. 7-1 at 15–16.) Citing Restatement (Second) of Torts § 766A, Defendants maintain that their allegations supporting Count III are sufficient because they concern Defendants' inability to perform on contracts with suppliers and other entities in purchasing shredder-related equipment and services. (Doc. 23 at 21–22.) BOA replies that Defendants have alleged no details regarding specific obligations with which BOA purportedly interfered, how BOA knew about those obligations, or what BOA did to intentionally interfere. (Doc. 27 at 9.)

19

The Vermont Supreme Court has recognized the tort of interference with contractual relations. *See generally Mitchell v. Aldrich*, 122 Vt. 19, 22–23, 163 A.2d 833, 836 (1960) (citing authorities including Restatement (First) of Torts § 766); *see also J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 21, 188 Vt. 245, 6 A.3d 701 (discussing interference with prospective business relations; citing Restatement (Second) of Torts § 768). Count III of Defendants' counterclaims is based on a section of the Restatement which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A.

Initially, it is unclear whether a cause of action exists in Vermont for the conduct described in § 766A. It does not appear that the Vermont Supreme Court has ever adopted § 766A. Moreover, § 766A has been criticized as overly broad. *See Gettis v. Green Mountain Econ. Dev. Corp.*, No. 581-12-01 Wrcv, 2004 WL 5456807 (Vt. Super. Ct. May 21, 2004) ("Given that wrongfulness of interference lies in the eye of the beholder and that interference is intentional if the defendant is substantially certain that it will result from his acts, thousands of acts could intentionally interfere with the plaintiff's contract relations by making the contract more difficult to perform." (quoting 2 Dobbs, *The Law of Torts* (2001), § 448 at 1270)), *aff'd*, 2005 VT 117, 179 Vt. 117, 892 A.2d 162.

In any event, it remains true that "[n]ot every act that disturbs a contract is actionable"; and that for any interference-with-contract claim, "[t]he act of interference must be wrongful or improper . . . by some measure beyond the fact of interference itself." *Kollar v. Martin*, 167 Vt. 592, 593, 706 A.2d 945, 946 (1997) (mem.). To determine whether interference is "improper,"

the Vermont Supreme Court looks to § 767 of the Restatement (Second) of Torts.  *Field v. Costa*,

2008 VT 75, ¶ 25, 184 Vt. 230, 958 A.2d 1164.  Section 767 provides as follows:

> In determining whether an actor's conduct in intentionally interfering with a
> contract or a prospective contractual relation of another is improper or not,
> consideration is given to the following factors:
>
> (a)   the nature of the actor's conduct,
> (b)   the actor's motive,
> (c)   the interests of the other with which the actor's conduct interferes,
> (d)   the interests sought to be advanced by the actor,
> (e)   the social interests in protecting the freedom of action of the actor
>         and the contractual interests of the other,
> (f)   the proximity or remoteness of the actor's conduct to the
>         interference and
> (g)   the relations between the parties.

Restatement (Second) of Torts § 767.  "The nature of the actor's conduct is a chief factor in

determining whether the conduct is improper or not, despite its harm to the other person."  *Id.*

§ 767 cmt. c.  Critically, "'[w]rongful' conduct requires something more than mere breach of

contract."  *Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 663 (3d Cir. 1993).

Here, as discussed at length above, Defendants have stated a breach-of-contract claim

based on allegations that Earth Waste was not in default at the time BOA issued its August 25,

2015 letter, and that BOA's announcement in that letter that it would stop making additional

credit available was an unexcused failure to perform.  Aside from that alleged contractual

"wrong," however, Defendants do not allege any facts that suggest the nature of BOA's conduct

rises beyond that level.  In addition, Defendants' allegations suggest that BOA's motive was to

exit the commodities-financing business.  The impact on Defendants' other contracts is at best

only a collateral consequence of BOA's actions in furtherance of that alleged motive.  None of

the other § 767 factors suggest that BOA's alleged conduct was "improper" as relevant to an

interference-with-contract claim.  The court will accordingly dismiss Count III.

**D.    Punitive Damages**

Defendants assert that BOA's conduct is sufficiently egregious to render it liable for punitive damages.  (Doc. 48 ¶ 71.)  BOA contends that Defendants' allegations do not suggest any conduct rising to the level for which punitive damages might be awarded.  (Doc. 7-1 at 16.) Defendants insist that this is the "extraordinary" case where punitive damages are appropriate. (Doc. 23 at 22.)

"[I]t is well settled law in Vermont 'that punitive damages are appropriate in contract actions in certain extraordinary cases where the breach *has the character of* a willful and wanton or fraudulent tort.'"  *Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, ¶ 39, 198 Vt. 109, 112 A.3d 754 (quoting *Ainsworth v. Franklin Cty. Cheese Corp.*, 156 Vt. 325, 331, 592 A.2d 871, 874 (1991)).  "A plaintiff must show actual malice on the defendants' part—as evidenced by conduct exemplifying personal ill will or showing a reckless or wanton disregard for the plaintiff's rights—and also that the defendants' actions were 'akin to a willful and wanton, or fraudulent, tort.'"  *Id.* (quoting *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 155, 761 A.2d 688, 696 (2000)).

Here, there is no allegation of personal ill will; at best Defendants' allegation is that BOA searched for a reason to find Defendants in default because BOA wanted to exit the commodities-financing business.  However, even if—as Defendants claim—BOA's claimed bases for declaring a default ultimately turn out to be unsupported, the broad and interlocking default provisions of the agreements gave BOA multiple pathways to declare default and seek remedies.  If BOA is incorrect about the Basic Fixed Charge Coverage Ratio, for example, that might prove a miscalculation, but not conduct akin to a fraudulent tort.  This case is not one of

the "extraordinary" cases where punitive damages should be considered for an alleged breach of contract.

## IV.    BOA's Motion to Strike Demand for Jury Trial

In their original and Amended Counterclaim, Defendants say that they "acknowledge[] the presence [of] written waivers of trial by jury in certain documents, on some issues," but Defendants demand "trial by jury on all issues so triable, as to which the Honorable Court finds jury has not been waived." (Doc. 6 at 6; Doc. 48 at 8.)  BOA asserts that it is entitled to an order striking Defendants' demand for a jury trial. (Doc. 7-1 at 17.)  Defendants contend that BOA has not carried its burden of proof on the enforceability of the waiver-of-jury-trial provisions. (*See* Doc. 23 at 24.)  BOA replies that, despite Defendants' lengthy exposition on the law, waivers of jury trial are nevertheless enforceable, and the waivers in this case should be enforced. (Doc. 27 at 10–11.)

The court may strike a jury demand if it finds that "there is no federal right to a jury trial" on some or all of the issues for which a jury trial has been demanded. Fed. R. Civ. P. 39(a)(2). The right to a jury trial is fundamental, but the right can be relinquished if done "knowingly and intentionally." *Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977).  Unless a party fails to make a timely demand for a jury trial under Fed. R. Civ. P. 38, there is a presumption against waiver. *See Washington v. N.Y.C. Bd. of Estimate*, 709 F.2d 792, 797 n.4 (2d Cir. 1983).  "Contract provisions waiving the right are narrowly construed, and the requirement of knowing, voluntary, intentional waiver is strictly applied." *Morgan Guar. Trust Co. of N.Y. v. Crane*, 36 F. Supp. 2d 602, 603 (S.D.N.Y. 1999).  "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported

waiver." *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 705 (S.D.N.Y. 2011)

(quoting *Sullivan v. Ajax Navigation Corp.*, 881 F. Supp. 906, 910 (S.D.N.Y. 1995)).

Here, the 2012 Loan Agreement contains an explicit jury trial waiver:

> [T]o the extent any Claim is not arbitrated, the parties irrevocably and
> voluntarily waive any right they may have to a trial by jury in respect of such
> Claim. . . . **WHETHER THE CLAIM IS DECIDED BY ARBITRATION
> OR BY TRIAL BY A JUDGE, THE PARTIES AGREE AND
> UNDERSTAND THAT THE EFFECT OF THIS AGREEMENT IS THAT
> THEY ARE GIVING UP THE RIGHT TO TRIAL BY JURY TO THE
> EXTENT PERMITTED BY LAW.**

(Doc. 1-13 at 18.)  The 2013 Loan Agreement and the agreements underlying Earth Waste's

$500,000 LOC and $2.5 million loan also contain explicit jury trial waivers:

> **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE
> FULLEST EXTENT PERMITTED BY APPLICABLE LAW[,] ANY
> RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL
> PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR
> RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT
> EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS
> CONTEMPLATED HEREBY OR THEREBY.**

(Doc. 1-24 at 17 (2013 Loan Agreement); Doc. 1-7 at 14 (Earth Waste's $500,000 LOC) (same);

Doc. 1-11 at 15 (Earth Waste's $2.5 million loan) (same).)[14]

Defendants correctly point out that courts consider a variety of factors to determine

whether a contractual waiver of a right to a jury trial was knowing and voluntary, including:

"1) the negotiability of contract terms and negotiations between the parties concerning the

waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative

bargaining power of the parties; and 4) the business acumen of the party opposing the waiver."

---

[14] NEQS's commercial credit card agreement contains a mandatory arbitration clause.
(*See* Doc. 1-27 at 5.)  Earth Waste's commercial credit card agreement appears to be silent on
this topic. (*See* Doc. 1-28.)  The parties' disputes are at best only tangentially related to the
commercial credit card agreements, so the court focuses on the extent of any jury trial waiver in
the other loan documents.

*Morgan Guar. Trust*, 36 F. Supp. 2d at 604.  But Defendants expend about six pages of briefing articulating points of law without supplying any analysis on any of these or other factors. (*See* Doc. 23 at 23–28.)  Although the burden is on BOA to prove that a waiver was voluntary and intentional, the facts strongly suggest that the waivers recited above are valid.[15]  It is unclear what else Defendants think BOA must prove.  *See Morgan Guar. Trust*, 36 F. Supp. 2d at 603 ("[J]ury trial waivers are common in loan agreements and loan guarantees, and these are regularly enforced.").

More important for present purposes, however, is the fact that—in stark contrast to the agreements cited above—the shredder loan agreement does not contain any provision waiving trial by jury.  (*See* Doc. 1-1.)[16]  As the discussion above makes clear, the shredder loan is at the center of Defendants' counterclaims.  Even BOA seems to concede that the counterclaims are fundamentally about who breached the shredder loan first.  (*See* Doc. 7-1 at 8.)  In light of the presumption against waiver, the court concludes that Defendants have not waived their right to trial by jury on their counterclaims.  *See Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 850 (8th Cir. 2014) ("[D]etermining whether JB Hanna's default under the 2005 JB Hanna loan triggered cross-defaults under the parties' other agreements hinges at least in part upon the interpretation and application of the cross-default provision in the 2005 loan agreement, as to which JB Hanna did not waive its jury-trial right.").

---

[15] Handwritten changes to some of the agreements support the conclusion that they were negotiable.  (*See, e.g.*, Doc. 1-13 at 11–12.)  Where it appears, the waiver language is conspicuous and in bold, all-capital letters.  Defendants suggest that they were "financially distressed," (Doc. 23 at 29), but on the other hand Defendants do not appear to be unsophisticated, especially as evidenced by their multiple corporate affiliates.

[16] (*See also* Doc. 7-1 at 17 (BOA's list of agreements between the parties that included jury trial waivers; conspicuously excluding the shredder loan agreement).)

## Conclusion

Bank of America's Motion to Dismiss (Doc. 7) is GRANTED IN PART and DENIED IN PART.  The portion of Defendants' breach-of-good-faith-and-fair-dealing claim (Count II) alleging that BOA had an improper ulterior motive when it cross-defaulted all of Defendants' loans is DISMISSED as duplicative of Defendants' breach-of-contract claim.  Count III is DISMISSED in its entirety.  Defendants' punitive-damages claim is DISMISSED.  The Motion is DENIED in all other respects.

Bank of America's Motion to Strike Defendants' Demand for a Jury Trial (Doc. 7) is DENIED.

Dated at Rutland, in the District of Vermont, this 4 day of January, 2017.

Geoffrey W. Crawford, Judge
United States District Court